UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

DONALD CUMMINGS,

        Defendants.

_____/

Case No. 21-cr-20606

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (ECF NO. 26)

### I.  INTRODUCTION

Defendant Donald Lee Cummings is charged in a one-count indictment as an unlawful user of a controlled substance in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3).  ECF No. 12.  Presently before the Court is Defendant's Motion to Suppress Statements (ECF No. 26).  The Motion is fully briefed, and the Court held a hearing on the Motion on May 10, 2022.  For the following reasons, the Court will **DENY** Defendant's Motion to Suppress Statements (ECF No. 26).

1

## II.   Factual Background

### A. Mr. Cumming's Learning Disability

Mr. Cumming's has a documented learning disability.  Def. Mot. to Suppress, ECF No. 26, PageID.113.  He repeated both the first and fourth grades.  *Id*.  In 2015, after being held back the second time, Mr. Cummings was referred to a psychologist for evaluation and diagnosed with a learning disability.  *Id*.  Based on that diagnosis, Mr. Cummings was referred for special education assessment, where he presented as "delayed across all of the primary curriculum domains, particularly primary reading, [and] reading comprehension."  *Id.* (internal quotation marks omitted) (alteration in original).  *Id.* at PageID.113-14.  He also scored "in the low range of standard scores for his overall intellectual ability."  *Id.* at PageID.114.  As a result, Mr. Cummings was enrolled in specialized education and an individualized education plan.  *Id*.

By 2017, Mr. Cummings' word recognition had reached a second-grade level, and his reading comprehension had reached a third-grade level.  *Id*.  Given that he was in eighth grade at the time, his overall performance was more than five grade levels below his grade level.  *Id*.  Mr. Cummings left school shortly after the 2017 assessments, and the 2016-2017 academic year was his last year of schooling.  *Id*.

2

### B.  The Investigation and Arrest

The United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating Mr. Cummings after identifying him as a suspect in three shootings.  ECF No. 39, PageID.184.  As part of the investigation, agents began surveilling Mr. Cummings social media accounts, where he posted several photos and videos of himself using drugs, advertising the sale of drugs, and possessing firearms.  *Id.* at PageID.186.  As a result, the agents obtained a search warrant for Mr. Cummings' house.  *Id.* (citing ECF No. 39-2, PageID.207).

At 7:50 AM on September 8, 2021, three months after Mr. Cumming's 18th birthday, twenty-one law enforcement officials—including federal agents, Detroit police officers, a Michigan parole officer, and a Michigan state trooper with a canine—executed search warrants for Mr. Cumming's house and car.  ECF No. 26, PageID.107, PageID.111.  When no one answered the door, the law enforcement officials forced entry into the home with a battering ram and Halligan tool.  *Id*.  Mr. Cummings and the other occupants of the home were handcuffed and held on the porch while the law enforcement officials conducted their search.  *Id*.

Ultimately, the law enforcement officials recovered a firearm loaded with an extended magazine, a second extended magazine, ammunition, Oxycodone, and marijuana from Mr. Cummings bedroom and scales from his car.  ECF No. 39,

3

PageID.187 (citing ECF No. 39-2, PageID.210-11).    The officials arrested Mr.

Cumming's for violating 18 U.S.C. § 922(g)(3), possession of a firearm by an

unlawful user of a controlled substance.    ECF No. 26, PageID.107, PageID.107.

After arresting Mr. Cummings, law enforcement officials transported him to the

ATF Detroit Field Office.  *Id.* at PageID.111.

### C. The Interrogation

Beginning around 9:50 AM, ATF Agents Allick and Brandon interviewed Mr.

Cummings in the ATF Detroit interrogation room.  ECF No. 26, PageID.111.

At the beginning of the interaction, Agent Brandon told Mr. Cummings they

"need to go over some paperwork before [they] have a conversation."  Gov. Ex. J at

1:00-1:02.[1]  In response to Agent Brandon's question, Mr. Cummings explains that

despite being arrested, he had never had his *Miranda* rights read to him.  *Id.* at 1:09-

1:14.  Thus, Agent Brandon read Mr. Cummings his *Miranda* rights.  *Id.* at 1:14-

1:46.    After reading each right, Agent Brandon asked Mr. Cummings if he

understood the right that had been read, and Mr. Cummings answered affirmatively

---

[1] Mr. Cummings attached an audio-only version of the interrogation to his Motion. *See* Def. Ex. A.  Because the Government submitted a version of the same interrogation with both audio and video, the Court will refer to the Government's exhibit.

4

each time.[2]  *Id.*   Agent Brandon then showed Mr. Cummings the Waiver Provision and determined Mr. Cummings had completed ninth grade in school and could thus "read and write okay."[3]  *Id.* at 1:46-1:52.   Agent Brandon asked Mr. Cummings to read the Waiver Provision aloud so he could verify Mr. Cummings' understanding. He also explained the Provision was "basically saying [Mr. Cumming's was] allowing [the agents] to have a conversation with [him] right now." *Id.* at 1:52-1:59.

Mr. Cummings' reading was stilted, and he tripped over words such as "read," *id.* at 2:03-05, and "willing," which he misread as "writing," prompting Agent Brandon to correct him, *id.* at 2:13-2:17.   Mr. Cummings also hesitated over the phrase "no promises or threats have been made to me," prompting Agent Brandon to explain that it meant "against [Mr. Cumming's] will" and that he hadn't promised Mr. Cummings anything or threatened him. *Id.* at 2:21-2:28.   Mr. Cummings agreed with this assessment. *Id.*   Mr. Cummings' also hesitated over the word "force,"

---

[2] After Agent Brandon asked if Mr. Cummings understood his right to have an attorney present during questioning, Mr. Cummings responded "tight, sure."  Gov. Ex. J at 01:25-01:31.   Agent Brandon asked Mr. Cummings to clarify his response, explaining that he knew what Mr. Cummings was saying but needed him to respond with a yes or no. *Id.* at 01:33-01:36.

[3] Although Mr. Cummings stated during the interrogation that he completed ninth grade, his school records indicate his last year of school was when he was in eighth grade. ECF No. 26, PageID.114. Ultimately, this slight discrepancy does not change the Court's analysis.

eventually asking Agent Brandon what the word was. *Id.* at 2:30-2:37. Then, the

following exchange occurred.

| | |
|---|---|
| Agent Brandon: | Force. |
| Mr. Cummings: | Force. |
| Agent Brandon: | Do you understand what that means?— |
| Mr. Cummings: | Yea, force. |
| Agent Brandon: | Like if I beat you up.  I haven't made you say anything.  Do you understand that? |
| Mr. Cummings: | Exactly, exactly, exactly. |
| Agent Brandon: | We haven't done any of that? |
| Mr. Cummings: | Exactly.  Nah, hell nah. |
| Agent Brandon: | Alright cool.  Alright so, it says, this last part here, "no force of any kind has been used against me." That's all true, right? |
| Mr. Cummings: | Yea, that's true. |
| Agent Brandon: | If that's true, you just gotta sign your name and print your name right there. |
| Mr. Cummings: | But, but why do I, why do I have to sign my name? Like . . . if I sign my name, I gotta talk? |
| Agent Brandon: | No, you can talk to me either way.  Whatever you decide to do, you can do. |
| Mr. Cummings: | Alright.  I got you. |
| Agent Brandon: | We're just having a conversation, that's all this is. Nothing crazy.  I got a couple questions for you and then we'll let you ask some questions for us. |

*Id.* at 2:36-3:12.  Mr. Cummings signed the Waiver Form.  *Id.* at 3:05-4:03.

After asking some introductory questions, *id.* at 4:12-5:28, Agent Brandon

asked Mr. Cummings if he was currently on "anything that would change or alter

6

[his] state of mind," *id.* at 5:28-5:34.    Initially, Mr. Cummings responded emphatically that he was not, but when asked if he takes any drugs, Mr. Cummings responded that he takes one or two "percs" (the street name for Oxycodone) per day after injuring his leg in a dirt bike accident, especially if it is raining or right before he is trying to go to sleep.  *Id.* at 5:37-6:15.  Mr. Cummings also stated that he has been smoking weed for a couple years and that he smokes between 10 and 20 blunts per day, with about 1.7 grams of weed per blunt.  *Id.*  at 6:20-7:32.  He later clarified that he started smoking when he was 13 or 14 years old.  *Id.* at 18:02-18:30.  Agent Brandon noted Mr. Cummings smokes "by far the most weed" of anyone to whom he had spoken.  *Id.* at 7:12-7:21.

The interrogation continued for approximately 15 minutes.  *Id.* at 4:12-18:35.  Mr. Cummings admitted to possessing two different guns (that he possessed at different times) and explained that he owns a firearm for protection but does not use it in connection with his cannabis business.  *Id*.  As Mr. Cummings and the ATF Agents exited the interview room, he asked if his lawyer was going to come.  *Id.* at 19:04-19:07.  Agent Brandon explained that Mr. Cummings would get a lawyer when he was "arraigned in court," and Mr. Cummings affirmed that he understood.  *Id.* at 19:07-19:11.

7

Upon returning to the interview room to wait, Mr. Cummings pulled the collar of his shirt over his face and took a nap. *Id.* at 23:45-28:43. When that proved uncomfortable, he laid down on the floor instead. *Id.* at 28:51; *see also* Gov. Ex. L at 00:00-36:16.

### III.   MOTION TO SUPPRESS

Mr. Cummings moves to suppress the statements he made to law enforcement after his arrest pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), the Fifth Amendment, and *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). ECF No. 26, PageID.106. Specifically, he argues "[h]is limited reading and language comprehension capabilities, combined with his youthful age and his overuse of marijuana and Oxycodone, made the *Miranda* warnings ineffective." *Id.* at PageID.117. Additionally, Mr. Cummings emphasizes that he "had never before been subjected to custodial interrogation," "ha[d] no prior convictions," and "the interrogation [had taken] place after more than 20 law enforcement officers descended into [Mr. Cumming's] house via battering ram, after he had been asleep only a couple of hours." *Id*.

The Government argues Mr. Cummings' waiver was voluntary, knowing, and intelligent despite his learning disability, age and relative inexperience with the criminal justice system, alleged intoxication. ECF No. 39, PageID.195-201. In

8

particular, it asserts his waiver was voluntary because it did not involve coercive police activity.  ECF No. 39, PageID.191, 201-04.  Additionally, the Government contends his waiver was knowing and intelligent despite his trouble reading the waiver language because the ATF agents verbally stated each *Miranda* right and provided explanations to resolve his reading comprehension issues.  *Id.* at PageID.193-94.  Moreover, the Government maintains other portions of the interrogation evidence Mr. Cummings' awareness of his waiver because he was lucid, coherent, and alert and he was able to push back on agents regarding the dates he acquired his firearms and the purposes for which he used them.  *Id.* at PageID.194-95.  Finally, the Government avers Mr. Cummings' question about his lawyer at the end of the interrogation intended to ask whether an attorney would be present at his initial appearance.  *Id.* at PageID.195.

In reply, Mr. Cummings first reasserts that he did not understand what was taking place because (1) he had never had his *Miranda* rights read to him before, but Agent Brandon quickly read through the *Miranda* form in 20 seconds; (2) Agent Brandon explained the waiver form "basically [] say[s] that [Mr. Cummings was] allowing [the agents] to have a conversation with [him] right [then];" (3) according to Mr. Cummings, Agent Brandon mischaracterized the purpose of the waiver form; (4) Mr. Cummings uses Oxycodone and smokes copious amounts of marijuana

9

daily, but the agent did not clarify whether he was under the influence at the time; and (5) Mr. Cummings is low functioning, as evidenced by his school records. ECF No. 49, PageID.464-65. Second, he contends the cases on which the Government relies reject each of Mr. Cummings individually, but none address defendants with all the impediments he faced. *Id.* at PageID.466. Finally, Mr. Cummings emphasizes that he need not show coercion to prevail, as whether a waiver was voluntary, which involves the question of coercion, is separate from whether the waiver was intelligent and knowing. *Id.* Nevertheless, he argues "there is sufficient evidence that the totality of the circumstances were inherently coercive." *Id.* at PageID.467 (citation and internal quotation marks omitted).

### A. Legal Standard

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). A suspect must be told "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or

10

appointed." *Miranda*, 384 U.S. at 444.  Statements elicited in contravention of this rule generally may not be admitted into evidence during a criminal trial.  *Id.* at 478. Nevertheless, a suspect "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444.

A court's inquiry into the validity of a waiver "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.*  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.*  (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

The totality of the circumstances inquiry requires a court to examine "all the circumstances surrounding the interrogation," including the suspect's "age, experience, education, background, and intelligence, and [] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.,* 442 U.S. at 725.

11

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver[] but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  The Government must prove the validity of the waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).  However, the court's inquiry into the validity of a *Miranda* waiver is done "'primarily from the perspective of the police,' such that where '[the] police had no reason to believe that [the defendant] misunderstood the warnings, . . . there is no basis for invalidating [the] *Miranda* waiver.'" *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (alterations in original) (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc)).

## B. Discussion

### 1. Cummings waived his *Miranda* rights voluntarily.

"Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir.1989) (citing *Connelly*, 479 U.S. at 157; *McCall v. Dutton*, 863 F.2d 454 (6th Cir. 1988)).  However, "[a] lesser quantum of coercion

12

is required where the suspect is intoxicated and the officers are aware of his intoxication." *United States v. Cooper*, No. CR 7:16-01-DCR, 2016 WL 2944661, at *5 (E.D. Ky. May 20, 2016) (citing *Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009); *United States v. Hampton*, 572 Fed. App'x. 430, 434 (6th Cir. 2014)).  This is because a court must consider the totality of circumstances when determining whether a *Miranda* waiver was voluntary.  *Finley v. Rogers*, 116 F. App'x 630, 637 (6th Cir. 2004).  The Sixth Circuit

> has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (citation and internal quotation mark omitted); *see also Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); *United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) ("[E]ven if defendant's cognitive or volitional capacity was impaired, that is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some

13

element of police coercion is always necessary.") (citation and internal quotation marks omitted).

As discussed above, Mr. Cummings does not specifically identify coercive behavior by the ATF agents but instead argues the "totality of the circumstances were 'inherently coercive.'"  ECF No. 49, PageID.467 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)).  The Court disagrees because Mr. Cummings was not subjected to "objectively coercive" police behavior.  *Johnson*, 351 F.3d at 260.

"[T]he fact that the police searched [Mr. Cummings's] house before the interrogation is irrelevant to the issue" of voluntariness.  *Finley*, 116 F. App'x at 637.  Additionally, the ATF agents "were not [] responsible for [Mr. Cummings' learning disability or alleged intoxication] or for the way [those conditions] manifested," so those cannot constitute coercive police activity for the purposes of voluntariness.  *Newman*, 889 F.2d at 95 (citing *Connelly*, 479 U.S. at 167) (noting Supreme Court upheld the confession of a man suffering from a psychosis that interfered with his ability to make free and rational choices).  Thus, the only potentially coercive police activities on which Mr. Cummings may rely in arguing his waiver was involuntary are Agent Brandon's explanation of the word "force"

14

and his exchange with Mr. Cummings immediately prior to Mr. Cummings signing

the Waiver Provision.[4]

For Mr. Cummings waiver to be voluntary, it must have been "the product of

a free and deliberate choice rather than intimidation, coercion, or deception."

---

[4] The Court also notes that "[a]lthough there is sufficient evidence to indicate that [Mr. Cummings] may have been intoxicated, the evidence does not indicate that the officers were aware of [Mr. Cummings'] intoxication." *United States v. Cooper*, No. CR 7:16-01-DCR, 2016 WL 2944661, at *5 (E.D. Ky. May 20, 2016). Mr. Cummings emphatically denied that he was presently under the influence of any mind-altering substances when Agent Brandon asked. Additionally, although he later told the agents that he regularly smokes marijuana and takes Oxycodone, a review of the interrogation recording reveals that Mr. Cummings did not appear intoxicated when interacting with the agents. Thus, "[b]ecause [Mr. Cummings'] alleged intoxication was not 'known to interrogating officers,' a 'lesser quantum of coercion" is not triggered by [Mr. Cummings'] intoxication.'" *Id.* (quoting *Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009)); *see also United States v. Hamilton*, 445 F. App'x 841, 844 (6th Cir. 2011) (holding intoxicated defendant voluntarily waived his *Miranda* rights because he was "alert, cooperative, and able to form questions while at the police station").

Additionally, although the Court recognizes Mr. Cummings was only three months beyond his 18th birthday at the time of the interrogation, "the mere recitation of [the defendant's] age . . . does not support the conclusion that [his] statement was involuntary." *Finley*, 116 F. App'x at 636. Indeed, several courts have upheld the validity of waivers for defendants with similar circumstances. *See, e.g., Kopp v. Birkett*, No. 1:04-cv-234, 2007 WL 922422, at *8-15 (W.D. Mich. Mar. 26, 2007) (affirming state court of appeals' determination that "uneducated" 18-year-old defendant with "limited intelligence," and "learning disabilities," who was suffering from withdrawals and sleep deprivation properly waived his *Miranda* rights where he appeared to understand his rights as read aloud to him, of which he had been previously advised, and understood officer's questions and responded to same).

*Burbine*, 475 U.S. at 421.  Additionally, he cannot have been "threatened, tricked, or cajoled into a waiver." *Miranda*, 384 U.S. at 476.  Here, Agent Brandon asked Mr. Cummings if he understood what the word "force" means and began to define it as "[l]ike if [he] beat [Mr. Cummings] up," but Mr. Cummings cut Agent Brandon off to affirm that he understood the word and then, importantly, seemingly agreed with Agent Brandon's definition.  Gov. Ex. J. at 02:34-02:41.  According to Black's Law Dictionary, "force" includes "[p]ower, violence, or pressure directed against a person or thing." *Force*, *Black's Law Dictionary* (11th ed. 2019).  Thus, Agent Brandon's definition was accurate, if not complete; in other words, the explanation was "sufficient for the purposes of conveying to [Mr. Cummings] the notion that the police did not force [him] to cooperate." *Finley*, 116 F. App'x at 638 (affirming state court of appeals' determination that officer's explanation of the word "coercion" as no one "pulling [defendant's] hair" or "twisting [her] arm to get [her] to talk" sufficiently conveyed "the notion that the police did not force [the defendant] to cooperate").  Therefore, the Court finds Agent Brandon's explanation of the word "force" was neither coercive nor deceptive nor cajoling.[5]

---

[5] Mr. Cummings does not argue the explanation was "intimidating" or "threatening" nor could he reasonably do so based on the Court's review of the interrogation recording.

16

Likewise, the Court concludes Agent Brandon's exchange with Mr. Cummings immediately before he signed the Waiver Provision was not coercive. Indeed, when Mr. Cummings asked if signing the Waiver Provision meant he had to talk, Agent Brandon said "no" and further explained that Mr. Cummings could do "whatever [he] decide[d] to do," including talk to Agent Brandon even without signing the Waiver Provision.  Gov. Ex. J.  at 02:55-03:03.   Again, while this explanation could have been better, it was technically correct.  Even if he had refused to sign the Waiver Provision, Mr. Cummings could have implicitly waived his *Miranda* rights by proceeding to talk to the ATF agents.  *See United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) ("a *Miranda* waiver may be clearly inferred . . . when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights and speaks.") (omission in original) (quoting *United States v. Nichols*, 512 F.3d 789, 798-99 (6th Cir. 2008)).   Agent Brandon's statements were neither deceptive nor unduly pressuring—indeed, he explicitly told Mr. Cummings he could do whatever he wanted to do—thus, the Court finds they were not "objectively coercive."

The Court also notes that both ATF agents maintained an amicable rapport with Mr. Cummings before, during, and after the interrogation.  *See generally* Gov. Ex. J.  They never raised their voices, they provided him with water and snacks, and

17

they even joked with him at times.  *Id*.  Nothing in Mr. Cummings' demeanor suggested discomfort with the situation.  *Id*.  Nor did he hesitate to answer any of the agents' questions or otherwise indicate that he wanted to stop the interrogation. *Id*.  Indeed, after indicating he recognized, and understood the meaning of, the word "force" once it had been read aloud to him, Mr. Cummings emphatically denied that Agents Allick and Brandon had "made [him] say anything."  *Id.* at 02:33-02:45. Thus, the Court concludes Mr. Cummings was not subjected to "objectively coercive" police activity that would render his *Miranda* waiver involuntary. *Johnson*, 351 F.3d at 260.

"Because the first prong of the test for involuntary statements— objectively coercive conduct—is not present, the Court finds that analysis of the second and third prongs of the [coercion] test—whether the behavior was sufficient to and did in fact overbear the Defendant's will—is unnecessary."  *United States v. Wood*, No. 3:08-CR-26, 2009 WL 212929, at *6 (E.D. Tenn. Jan. 29, 2009) (citing *McCall*, 863 F.2d at 459).

### 2. Cummings waived his *Miranda* rights knowingly and intelligently.

As discussed *supra*, for a waiver to be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Burbine*, 475 U.S.

18

at 421.  The issue for the Court is not whether the "criminal suspect kn[e]w and underst[oo]d every possible consequence of a waiver of the Fifth Amendment privilege," but whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."  *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Mr. Cummings contends his limited reading and reading comprehension capabilities, youthful age, regular drug use, relative sleep deprivation, and inexperience with the custodial interrogations all served to undermine the status of his waiver as knowing and intelligent, particularly in light of Agent Brandon's less-than-perfect explanations.  The Court recognizes that someone with a similar background to Mr. Cummings could very well have not understood their *Miranda* warnings under these circumstances; however, under the totality of the circumstances and given the evidence before it, the Court finds that Mr. Cummings waiver of his *Miranda* rights was knowing and intelligent.

As a threshold matter, Agent Brandon read each *Miranda* warning to Mr. Cummings exactly as it appeared on the *Miranda* Form.  Moreover, after reading each warning, Agent Brandon asked Mr. Cummings if he understood the right that had just been read to him, and Mr. Cummings affirmed that he did each time.

19

The Court notes that Mr. Cummings struggled at time with reading the Waiver Provision; however, that does not necessarily mean that he was unable to understand what he had read once certain words had been identified for him.  After they finished going over the Waiver Provision, the last sentence of which affirmed "no force of any kind" had been used against the signatory, Agent Brandon asked Mr. Cummings if "that[] [was] all true" and directed Mr. Cummings to sign the Provision if it was. Gov. Ex. J. at 02:44-02:54.  Mr. Cummings now argues Agent Brandon's question, which followed shortly after his explanation of the word "force," indicated the document Mr. Cummings was being asked to sign was a certification that he had not been beaten by the officers.  ECF No. 26, PageID.118.  The Court disagrees with this interpretation of the interaction.  At the time, Mr. Cummings was clearly aware that signing the document was linked to waiving his right to remain silent.  This is evidenced by the fact that he immediately asked Agent Brandon if signing his name meant he had to talk.  Gov. Ex. J.  at 02:55-03:00.  It took only about a minute for Mr. Cummings go through the Waiver Provision, even with his reading difficulties and Agent Brandon's explanations.  Given the short time frame, it is not surprising Mr. Cummings interpreted Agent Brandon as Agent Brandon intended, Mr. Cummings was to sign the document if he agreed *everything* in the Waiver Provision he had just read was true.

20

Additionally, Mr. Cummings asserts Agent Brandon's response to his question about whether he had to speak if he signed the Waiver Provision presumed his compliance with the interrogation, regardless of whether Mr. Cummings signed the form.  As discussed *supra*, Agent Brandon's explanation, although less than perfect, was technically correct in that Mr. Cummings could refuse to sign the Waiver Provision and then still implicitly waive his *Miranda* rights by talking to Agent Brandon anyway.

Several courts in this Circuit have upheld *Miranda* waivers where the officer's explanation of the waiver form or provision was less than perfect.  *See, e.g.*, *Finley*, 116 F. App'x at 637-38 (affirming state court of appeals' determination that officer's explanation of the word "coercion" as no one "pulling [defendant's] hair" or "twisting [her] arm to get [her] to talk" sufficiently conveyed "the notion that the police did not force [the defendant] to cooperate" and that defendant waived her rights knowingly and intelligently); *Greeno v. Bradshaw*, No. 3:05CV1013, 2007 WL 789578, at *11 (N.D. Ohio March 14, 2007) (affirming state court of appeals' determination that officer's "lengthy and unorganized" explanation of "waiver" because, *inter alia*, it conveyed defendant's "right to stop" the interrogation and have a lawyer present); *United States v. Angeles*, No. 3:07-CR-92, 2008 WL 656065, at *2 (E.D. Tenn. Mar. 6, 2008) (finding officer's definition of "coercion" as "to feel

21

forced to speak" to him and his colleague was sufficient to ensure defendant understood *Miranda* waiver, especially because "[t]he sentence ha[d] the same meaning and c[ould] be properly understood with or without the word coercion"). Here too, Agent Brandon's explanations were sufficient to convey (1) the meaning of the word "force," (2) that signing the Waiver Provision related to everything Mr. Cummings had read in the Waiver Provision, not just the sentence regarding "force," and (3) that Mr. Cummings had control over whether he spoke to Agents Allick and Brandon.

Moreover, the case on which Mr. Cummings relies in arguing that commentary regarding, and deviations from, the traditional *Miranda* warnings and waiver invalidate waiver is distinguishable in several respects.   In *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (en banc), the officer going over the *Miranda* warnings with the juvenile defendant deviated significantly from the text of the form containing the juvenile warnings. *Id.* at 1002-03.  Specifically, while administering the warnings, the officer repeatedly minimized their significance while frequently assuring the defendant he was not under suspicion and incorrectly stated the defendant only had a right to counsel if he was involved in a crime.  *Id*.  The officer's "explanation of a one-page *Miranda* warning form consumed twelve transcribed pages of text" evidencing "the confusion generated by the detective's obfuscation."

22

*Id.* at 1003.  It was for those reasons that the Ninth Circuit found the warnings given to that defendant "constitutionally deficient."  *Id*.

Here, in contrast, Agent Brandon read the *Miranda* warnings exactly as they were written on the Form.  While he went through the Form a bit quickly, Agent Brandon asked Mr. Cummings if he understood each right after reading it and insisted that Mr. Cummings verbally respond in the affirmative before he moved on the next right.  Indeed, when Mr. Cummings responded "tight, sure" to Agent Brandon's question of whether he understood his right to have an attorney present during questioning, Agent Brandon asked Mr. Cummings to clarify his response.  Given these facts, the Court cannot find Mr. Cummings' advisement of rights was constitutionally deficient.

Mr. Cummings learning disability, age, lack of prior experience with a custodial interrogation, and drug use do not, in this instance, change the Court's analysis.  As the Sixth Circuit has found, having mental deficiencies or being of "low average intellect . . . is not dispositive."  *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005) (noting "several instances" where other circuits had determined "defendants, despite their mental retardation or low I.Q.'s, were found to have waived their rights knowingly and intelligently").  Indeed, the Sixth Circuit has already found that reading at a third-grade level, as Mr. Cummings does, is not

23

sufficient to undermine an otherwise knowing an intelligent waiver.  *Jackson v. McKee*, 525 F.3d 430, 436 (6th Cir. 2008).  Notably, Mr. Cummings did not read his *Miranda* rights himself; they were read to him by Agent Brandon.  Also, after reading the Waiver Provision aloud, Mr. Cummings orally agreed to the waiver before signing it.  "[T]here is nothing cognitively complex about the advice that one has a right to remain silent and not to talk to the police," *Finley*, 116 Fed. App'x. at 638, and nothing in the record belies that Mr. Cummings understood that signing the Form was linked to giving up his right to remain silent.  That Mr. Cummings was only three months past his eighteenth birthday and had not previously been read his *Miranda* rights does not undermine this conclusion based on the record before the Court.

Additionally, a defendant can knowingly and intelligently waive his *Miranda* rights even while intoxicated if he is "alert, coherent, and lucid."  *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008) (affirming district court's finding that defendant knowingly and intelligently waived his *Miranda* rights despite being under the influence of Vicodin and marijuana); *United States v. Jones*, 935 F.2d 271 (6th Cir. 1991) (per curiam) (finding "[t]he question of [the defendant]'s incapacitating intoxication, or lack thereof, was simply a credibility issue"). ‼Here, ‼ Mr. Cummings emphatically denied that he was presently under the influence of any

24

mind-altering substances when Agent Brandon asked him at the start of the interrogation. Assuming *arguendo* that he was still under the influence of previously ingested marijuana or Oxycodone, a review of the interrogation recording reveals that Mr. Cummings did not appear intoxicated when interacting with the agents. He was coherent and lucid. *See United States v. Hayek*, No. 2:18-CR-160, 2021 WL 2856527, at *3 (E.D. Tenn. July 8, 2021) ("On the tape, defendant is heard as engaged and articulate during the exchange as well as throughout the interview. Therefore, even if defendant was intoxicated at the time, as he contends, there is no evidence that he could not understand his rights or that he was waiving them."). Indeed, Mr. Cummings had sufficient presence of mind to push back on a number of the agents' statements regarding several topics, including the amount of marijuana he smokes per day, the scope of his marijuana sales, for how long he owned his firearms, and for what purpose he used those firearms.[6] *See Garner*, 557 F.3d at 261 (noting that defendant evidenced "the capacity to understand and appreciate the consequences of speaking to the police about his criminal conduct" during his

---

[6] This also undermines Mr. Cummings' argument that his sleep deprivation impacted his ability to make a knowing and intelligent waiver. *See United States v. Edwards*, No. 4:10-CR-00018, 2011 WL 582625, at *5 (W.D. Ky. Feb. 9, 2011) ("Although [the defendant] was on medication and sleep deprived, there is no indication that this affected his ability to knowingly and intelligently waive his Miranda rights.").

25

interrogation); *Dunn*, 269 F. App'x at 573 (noting that defendant "had a lot of valuable input on things").

As stated *supra*, the Court recognizes that another defendant with a similar background and in similar circumstances might not have understood his *Miranda* warnings or the nature of the right he was waiving; however, that is not Mr. Cummings' situation on the record before the Court. Accordingly, the Court concludes the Government has shown by a preponderance of the evidence that Mr. Cummings' waiver was knowing and intelligent.

Because the Government has shown Mr. Cummings' waiver was voluntary, knowing, and intelligent, Mr. Cummings' Motion to Suppress (ECF No. 26) is denied.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Mr. Cummings' Motion to Suppress Statements (ECF No. 26) is **DENIED**.

**IT IS SO ORDERED**.

/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  July 8, 2022

26

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 8, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

27